IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00827-REB-PAC

BRYCE POTTER, a Minor by and through her parents and Next Friends, LAURA POTTER and TRISTAN POTTER, and LAURA POTTER and TRISTAN POTTER, Individually,

Plaintiffs,

-vs-

DEBRA H. BOWMAN, M.D. and HCA-HEALTH ONE, L.L.C., d/b/a SWEDISH MEDICAL CENTER,

Defendants.

**PLAINTIFFS' "DAUBERT" MOTION IN LIMINE TO PRECLUDE DR. HERBERT SANDMIRE'S NOVEL "MATERNAL PROPULSIVE FORCES" INJURY CAUSATION THEORY WITH SUPPORTING MEMORANDUM**

NOW COME Plaintiffs, by and through, their attorneys, HILBORN & HILBORN, P.C. and moves this Honorable Court in limine to preclude Dr. Sandmire's novel maternal propulsive forces injury causation theory for the reason that Dr. Herbert Sandmire's methodology does not satisfy the requirements of Daubert v Merrill Dow Pharmaceuticals and FRE 702, discussed in detail, *infra*.

## I. INTRODUCTION

Plaintiff's motion is based on Daubert v Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) , Federal Rule of Evidence 702 and its progeny. Prior to explaining why and how Dr. Sandmire's methodology is deficient it is necessary to explain the following concepts: what "brachial plexus" is, what a "shoulder

dystocia" is, what the countermeasures to a "shoulder dystocia" are, to understand the Bryce Potter delivery and the historical medical literature regarding causation of brachial plexus.

### *A. The Brachial Plexus*

The brachial plexus is a network of nerves that conducts electrical signals from the spine to the shoulder, arm and hand. The brachial plexus is derived from 5 "roots" or spinal nerves that exit the spinal cord in the neck. The nerves then pass through the axilla or armpit behind the collarbone (clavicle), and split into the final nerve brachials that supply the muscles and skin of the shoulder, arm, elbow and hand. The roots are named for the local levels of spinal cord from which they exit. The upper roots (C5 and C6) exit from the cervical (meaning "neck") and fifth and sixth vertebrae. The middle root (C7) exits above the cervical vertebrae and the lower roots exit from C8, below the seventh cervical vertebrae (in T1, below the first thoracic vertebrae). The upper roots supply upper structure (C5 to the shoulder, C6 and C7 to the elbow) and the lower roots supply the forearm and hand.

Brachial plexus injuries are caused by damage to those nerves and symptoms may include a limp or paralyzed arm, lack of muscle control in the arm, hand or wrist and a lack of feeling or sensation in the arm. Attached as **Exhibit 1** is anatomical drawing of the brachial plexus in an infant. There are four types of brachial plexus injuries (**Exhibit 2**).[1]

[1] 1)Avulsion, the most severe type in which a nerve is torn away from the spinal column; 2)Rupture, where the nerve is torn but not at the spinal attachment; 3)Neuroma, where the nerve has tried to heal itself, but scar tissue has grown around the injury, putting pressure on the injured nerve and preventing the nerve from conducting signals to the muscle; and 4)Neuropraxias or stretch, where the

As a result of the trauma during her delivery, Bryce Potter suffered neuroma to her C5, C6 and C7 nerve roots.

### *B. Shoulder Dystocia*

A shoulder dystocia is a complication during the delivery process wherein one or both the fetus' shoulders become impacted or caught in the birth canal after the fetal head has been delivered. Attached as **Exhibit 3** is a diagram depicting the fetus with shoulder impaction both at the pubic synthesis after the fetal head is delivered. The "up" shoulder of the fetus, or the shoulder closest to the mother's abdomen is always referred to as the anterior shoulder. The down shoulder, or the shoulder closest to the perineum, or the mother's coccyx is always referred to as a posterior shoulder.

When shoulder dystocia is encountered, whether it is anterior or posterior, a number of steps are immediately employed by the delivering physician. The first recommended maneuver is known as the McRobert's maneuver[2]. This maneuver is named for Dr. William A. McRobert and is essentially the sharp flexing of the thighs against the maternal abdomen. Attached as **Exhibit 4** is a diagram of a delivering mother in the McRobert's position, with the mother herself applying the force necessary to flex the legs back. Attached as **Exhibit 5** is a picture of the delivering nurse applying pressure for the McRobert's maneuver to one leg with the other hand providing suprapubic pressure, which is discussed below.

---

nerve has been damaged, but not torn. Neuropraxia is the most common form of brachial plexus injury.

[2]This maneuver is incorrectly referred to by Dr. Bowman as "the McDaniels maneuver".

**Exhibit 6** is a depiction of the Woods corkscrew maneuver. **Exhibit 7** is a depiction of delivery of the posterior arm. **Exhibit 8** is a depiction of an incorrect delivery two maneuvers pertinent to the delivery of Bryce Potter.

### *C. The Bryce Potter Delivery*

This case involves the application of excessive force in attempting to deliver a baby whose shoulder had become stuck behind the mother's pubic synthesis (a situation referred to as shoulder dystocia". The lateral force applied to the head was such that a brachial plexus injury occurred.

### *D. It Is An Established Medical Fact That Brachial Plexus Injuries At Birth Are Caused By Excessive Lateral Traction By The Physician*

It has been well established for over 100 years of medical science that brachial plexus injuries are caused by the delivering physician using excessive lateral traction while delivering the baby after the fetal head has delivered.[3] According to at least one set of

---

3

*See* Appendix to Plaintiff's Motion in Limine ("Appendix"); Williams Obstetrics, 21st Ed. Cunningham, Gant, Leveno, Gilstrap, Hauth & Wenstrom, eds., p 460 (2001) ("[Brachial plexus injury] *usually* results from downward traction on the brachial plexus during delivery of the anterior shoulder"); *See* Williams Obstetrics, 20th Ed. Cunningham, McDonald Gant, Leveno, Gilstrap, Hankins & Clark, p 999 (1997) ("The function of the fingers usually is retained. The lesion results from stretching or tearing of the upper roots of the brachial plexus, which is readily subjected to extreme tension as a result of pulling laterally upon the head, thus sharply flexing it toward one of the shoulders.") *See* Piatt JH, "Birth Injuries of the Brachial Plexus." *Clin Perinatol* 2005:32:40 ("At the beginning of the last century, cadaver studies by Clark and Sever produced sequential fraying and rupture of the C5 through T1 roots by applying traction to the upper limb"); *See* Ushing MR, *Management of Birth Injuries*. Clin Perinatol 2005; 32:25 ("The pathogenesis of injury often involved stretch injury when shoulder dystocia requires extreme lateral flexion and traction of the head."); *See Maternal-Fetal Medicine*, 4th Ed. Creasy, Resnik eds., p 546 (1999) ("The brachial plexus is subject to injury when excessive downward traction and lateral extensions of the fetal head and neck occur in an attempt to deliver the anterior shoulder."); *See* Acker DB, Gregory KD, Sachs BP, and Friedman EA. "Risk factors for Erb-Duchenne Palsy." *Am J Obstet and Gynecol* 1988; 71(3):389 ("Traction and lateral flexion to resolve a shoulder dystocia is causative.") *See Neonatology, Pathophysiology and Management of the Newborn*, 2d ed., Avery GB, ed., p 906 ("It is the result of traction and lateral flexion of the neck. In vertex presentations, it occurs by traction and lateral flexion applied to deliver the shoulder...); Allen R, Sorab J, Gonik B, *Risk factors for shoulder dystocia:*

authors, "[s]ince Sever's paper in 1916, the medical community ***firmly*** believes that direct or indirect compression from delivery instruments or fingers with subsequent traction to the roots is the most likely cause."[4]

Defendants' experts witnesses all acknowledge the existence of this prodigious body of medical science showing excessive lateral traction being causative of brachial plexus injuries. Indeed, the expert witnesses concede that Bryce Potter's injury could have been caused by the physician's use of excessive lateral traction.

The unscientific methodology relied upon by the Defendants is based on unreliable and unscientific retrospective chart reviews, conclusions with no known error rate, no known measurements of time or place of injury in utero, and plagued with varying definitions of shoulder dystocia affecting the accuracy of reporting. *See Spellacy WN, Letters to the Editor re: "Erb's palsy without shoulder dystocia." Am J. Obstet Gynecol*

---

*an engineering study of clinician-applied forces*. Obstet Gynecol 77(3):352-5 (1991) ("The faster force is applied to the fetal head, the more vulnerable the newborn is to injury...; *See Erb/Duchenne's palsy: a consequence of fetal macrosomia and method of delivery.* Obstetrics & Gynecology, Vol. 68, No. 6, Dec. 1986, 784-788, McFarland, et al, ("Injuries to the brachial plexus occur when there is a strong lateral traction on the head and neck or a downward traction on the shoulders . . ."); *See The Immediate & Long Term Outcome Of Obstetric Birth Trauma*, Am.J.Obstet.Gynecol, Volume 117, No. 1, 51-56 (Brachial plexus is caused by damage to the nerve fibers consequent to excessive lateral traction of the neck during delivery); See Textbook of Pediatrics 14th Edition, Bherman, p 456 ("These injuries occur when lateral traction is exerted on the head and neck during delivery of the shoulder in a vertex presentation.") *See* Operative Obstetrics 3rd Edition, Apuzzio J, Vintzileos A, Iffy, L, p 259 ("However, since the maternal forces mobilized during labor and delivery are expulsive in nature, it is difficult to perceive a natural mechanism which could imitate the effect of traction injuries. The latter have been proven to be associated with forceful extraction of the shoulders.") *See* Neurology of the Newborn 4th Edition, Volpe J, p 826 ("Brachial plexus injury is thought to result from stretching of the brachial plexus, with its roots anchored to the cervical cord, by extreme lateral traction. The traction is exerted via the shoulder, in the process of delivering the head with breech deliveries, and via the head, in the process of delivering the shoulder in cephalic deliveries.") *See* Hand Clinics Elective Microsurgery, Vol. 15, No. 4, Terzis, Papakonstantinou , p 718 (1999).

[4] *Management of Obstetric Brachial Plexus Palsy*, Hand Clinics, Elective Microsurgery, Volume 15, Number 4, November, 1999; 718, Terzis, Papakonstantinou (emphasis added). (*See* Appendix)

*1998; 179(2): 561 (***Exhibit 9***).*

## II. DR. SANDMIRE'S NOVEL MATERNAL PROPULSIVE FORCES INJURY CAUSATION THEORY IS NOT ADMISSIBLE UNDER DAUBERT

Dr. Sandmire's novel maternal propulsive forces injury causation theory is not admissible under *Daubert* and its progeny. Dr. Sandmire's novel[5] theory can be summarized as follows:

> And it's my opinion that the disproportionate descent of the head while the body and shoulder do not move causes a stretching of the neck and therefore stretching of the brachial plexus and therefore a rupture of the brachial plexus, ***if that's what happened in this case...It's not determinable as to the timing of it.***

(**Exhibit 10**, p. 11). Dr. Sandmire's novel speculation[6] can be boiled down to one sentence: "I say it's more likely than not that the maternal propulsive forces are what cause it." (**Exhibit 10**, p. 26).

### A. Dr. Sandmire's Methodology Is Subject To Ascertainment Bias

Dr. Sandmire admitted that prior to publication of the articles he is relying upon that it was the ***generally accepted*** wisdom that physician application of excessive traction during delivery was the cause of brachial plexus injury. (**Exhibit 10**, pp. 50-51). After such an admission it is necessary to examine the basis for Dr. Sandmire's opinions that

---

[5]Even the authors of *Maternal-Fetal Medicine*, Principles & Practice, 5th edition, agree that Dr. Sandmire is prone to unsupported speculation: "It is *postulated* that these injuries resulted from chronic nerve compression from malposition in utero. (Sandmire & Demott: 2002 . . .)" Id. at 677 (**Exhibit 11**). "*Postulate*" is defined as "to assume *without proof* to be true, real or necessary, especially as a basis for argument. Webster's New 20th Century Dictionary, p. 1408.

[6]Dr. Sandmire's "in-utero" maternal forces injury causation theory has previously been rejected by a federal court under *Frye*. (**Exhibit 12** , opinion in Massey v Winfield, M.D.)

maternal propulsive force cause brachial plexus injury. Dr. Sandmire claims that the studies relied upon by him state that a significant percentage of brachial plexus injuries occur in labors with no ***reported*** shoulder dystocia; therefore his theory that maternal propulsive forces cause brachial plexus must be true.

Numerous peer-reviewed publications identify '***ascertainment bias'*** as a problem with the articles relied upon by Sandmire for the basis of his opinions. "*Ascertainment bias*" is produced when the kind of patients gathered does not represent the cases originated in the population. *Bias,* J. Epidemiol. Community Health 2004; 58;635-641, Rodrigues and Llorca. (**Exhibit 13**). "Ascertainment bias" is a validity error introduced when there is an inappropriate definition of the eligible population[7]. (**Exhibit 13**, Table 1).

According to Operative Obstetrics, 3rd Edition, Chapter 21, "Shoulder Dystocia" (**Exhibit 14**):

> ***Shoulder dystocia has no generally accepted definition*** . . . . .The reported incidence of shoulder dystocia is .15-1.7% of all deliveries. The more than 10-fold difference in range is an indication of the fact that **the diagnosis is subjective** and depends upon the training, experience, emotional stability, and st

According to an article relied upon by Dr. Sandmire, "milder forms [of shoulder dystocia] may be overdiagnosed or ***underdiagnosed***. . . . Differences in reported rates are partly because of ***clinical variation in describing shoulder dystocia and the patient population being studied***." ACOG Practice Bulletin, Number 40, November, 2002[8].

[7] Dr. Sandmire incorrectly defines "ascertainment bias" as "that's when your conclusions are incorrect because you haven't asked the right questions." (**Exhibit 10**, pp. 18-19).

[8] Dr. Sandmire agreed that ACOG practice bulletins are put out by the OB-GYN community and reviewed by a committee of OB-GYN before publication. (**Exhibit 10**, pp. 54-55).

(**Exhibit 15**)(emphasis added). Williams Obstetrics, 21st edition, Chapter 19, "Dystocia" at 460 states "**only ½ of shoulder dystocias were diagnosed by the clinician**"[9] (**Exhibit 16**). Assuming the statistics in Williams Orthopedics to be true, Dr. Sandmire's opinions would be subject to a 50% rate of error. The author (Dr. Gherman) of one of the articles relied upon by Dr. Sandmire[10] admitted that "***we agree that there is inherent ascertainment bias in our retrospective study***" and acknowledged that the definition of shoulder dystocia may be considered ***arbitrary***. (**Exhibit 17**, Reply to Erb's palsy without shoulder dystocia, Am J. Obstet Gyncol., Volume 179, Number 2). Another one of the authors relied upon by Dr. Sandmire is on record as stating that ***71% of shoulder dystocias are not recognized***[11]. (**Exhibit 21**, Gonik, et al, Shoulder Dystocia Recognition Differences in Neonatal Risk for Injury, 8 Am. Jrn. Of Perinatology No. 1, Jan. 1991). Dr. Sandmire has testified that there are shoulder dystocias that occur that doctors miss and therefore do not report. (**Exhibit 22**, pp. 102-103).

---

[9]This is in accord with the peer-reviewed literature. ACOG Updated, Volume 29, June 2004 ("*I think **it's probably underreported**. I think most people, if the baby delivers, everything else is fine, may not have either recognized a shoulder dystocia or may have not included it in their final written information*.")(**Exhibit 18**); *What factors are associated with neonatal injury following shoulder dystocia?*, Journal of Perinatology (2006)85-88 ("*[w]hile shoulder dystocia cases were identified using both ICD-9 coding during delivery and the hospital perinatal database as well as a review of these charts, ascertainment bias is a possibility. This is of particular concern in cases where shoulder **dystocia was not recognized or recorded***.")(**Exhibit 19**); Risk Factors For Shoulder Dystocia: An Engineering Study of Clinician Applied Forces, Obstetrics & Gynecology, Volume 77, No. 3, March, 1991 ("*Because birth injuries frequently occur when shoulder dystocia is **not recognized**, it appears that force training would also reduce the risk of iatrogenic birth injuries associated with excessive forces during vaginal delivery*.")(**Exhibit 20**)

[10]Gherman, Ouzounian, Miller, Kwok, Goodwin. Spontaneous vaginal delivery: A risk factor for Erb's palsy? Am J Obstet Gynecol 1998; 178:426.

[11]Dr. Sandmire's opinions would then have a 71% potential rate of error - too speculative to be admissible in federal court under *Daubert*.

Dr. Sandmire once again admitted that it is unknown whether the work he relied upon for his opinions in this case are scientific.

> Q. With respect to the work that you have published yourself in the context of brachial plexus and shoulder dystocia, have you gone about **trying to rule out *ascertainment bias*** and, if so, what have you done?
>
> A. I have – ***I've thought about it***, and I've come to the conclusion that the so-called under reporting that has been brought up is ***not determinable***[12], and therefore ***no one knows whether there's under reporting or not***...So ***there's no need to do any finagling about error rates and so forth***.

(**Exhibit 10**, pp. 39-40) When asked to the extent that there was "ascertainment bias" in the studies relied upon by him, would he agree that his methodology was flawed, Dr. Sandmire responded no and added: "There's no way that anybody could know that that's occurring, and there's no way anybody could prove that it wasn't occurring." (**Exhibit 10**, p. 85).

### *B. Dr. Sandmire's Maternal Propulsive Force Theory Is Novel And Subject To Greater Scrutiny Under Daubert*

Dr. Sandmire admitted that prior to publication of the articles he is relying upon that it was the generally accepted wisdom that physician application of excessive traction during delivery was the cause of brachial plexus injury. (**Exhibit 10**, pp. 50-51). Dr. Sandmire's novel theory deserves enhanced scrutiny under Daubert. A known technique [theory] that has been able to attract only minimal support within the community may properly be viewed with skepticism. Daubert, at 594.

### *C. Dr. Sandmire Failed To Use The Scientific Method When Formulating His Maternal Propulsive Forces Injury Causation Theory Compelling*

[12] Dr. Sandmire admitted that he did not perform any statistical analysis himself in support of his flawed hypothesis. (**Exhibit 10**, p. 81)

***Rejection Under Daubert***

The first consideration, which asks whether the theory or methodology has been subjected to the scientific method, is the most weighty. Bradley v Brown, 852 F.Supp. 690, 698 (N.D.Ind 1994); *citing* Daubert, *supra*, 2796. **Scientific method is based on generating hypotheses and testing them to see if they can be *falsified*.** Id; *citing* Daubert, *supra* at 2796(emphasis added). Scientific method is what distinguishes science from other fields of human inquiry. Id. In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Daubert, *supra*, at 590.

Subjecting opinions to the "scientific method" is an absolute minimum to ensure reliability. *See* Chapman v Maytag Corporation, 297 F.3d 682, 687 (7th Cir. 2002), Smith, v Ford Motor Company, 215 F.3d 713 (7th Cir. 2000); Wintz v Northrop Corp., 110 F.3d 508, 512 (7th Cir. 1997). The "*scientific method*" (**Exhibit 23**, definition) is a universally-accepted, organized approach to the study of science.[13]

The importance of the use of the *scientific method* is discussed at great length in David L. Faigman, et al, *Modern Scientific Evidence: The Law and Science of Expert Testimony*, Volume I, §4-1.0 (2002).[14] The "scientific method" is an absolute minimum

---

[13] The scientific method is as follows: 1)Observation-collecting data; 2)Hypothesis-forming a preliminary possible explanation of the data; 3)Testing-test the hypothesis by collecting more data; 4)Results-interpreting the results of the test and deciding if the hypothesis should be rejected; hypothesis is rejected if the results contradict it, showing that it is wrong. This step is also know as the "attempt to falsify"; and 5)Conclusion-stating a conclusion that can be evaluated independently by others.

[14]"The subject of scientific method is a necessary foundation of *every* discipline that seriously attempts to gain knowledge of the world through systematic empirical inquiry - the physical, biological, behavioral and social sciences alike . . ." Id. At 120.

requirement to ascertaining whether there are valid, useful and informative answers.[15]

Dr. Sandmire failed to use the "scientific method" when formulating his opinions in this case. Dr. Sandmire testified what he did to attempt to falsify ascertainment bias in the studies relied upon by him:

Q. Okay. **In the context of the scientific method, tell me what you've done in an attempt to falsify your hypothesis that there's no under reporting** [of shoulder dystocia]?.
A. **I haven't done anything** except report the overwhelming literature . . .

* * * * * *

Q. At least **never gone about attempting to falsify it**, correct?
A. I've never falsified anything, period[16].

* * * * * *

Q. Well, then, since that's the case, why don't you tell me what you have done specifically to ***attempt to falsify your hypothesis that there*** **is no under reporting** [of shoulder dystocia]?
A. ***I've never done anything to falsify anything, as far as I know***.

* * * * * *

Q. Do you agree, Doctor, that your theory that maternal propulsive forces more likely than not cause brachial plexus injury ***cannot*** *be objectively disproved*?
A. Well, I've said in the past and I think in my article, maybe even in my report, that *there is a potential for doing some research*...**So I don't know if it will ever be possible to find out – to disprove what I'm saying in a direct**

[15] "Note that a hypothesis or a theory is never proven or confirmed to be true. Testing is capable only of disconfirming. But theories that withstand such ***attempts at falsification*** better and longer become accepted, at least until something better comes along. The opposite approach can readily be seen in non-scientific activities of numerous kinds, where investigators engage in a search for evidence that confirms their suspicions. This "confirmatory bias" is based on the erroneous assumption that a theory is confirmed by the accumulation of facts consistent with that theory. . . . It is the diligent search for inconsistencies, for falsification, that really puts a theory to the test. A theory that can withstand such scrutiny is one that deserves credence." Id. at 125-126.

[16] "The merit of a scientific statement depends on the degree to which it has survived ***attempts at falsification***." David L. Faigman, et al, *Modern Scientific Evidence: The Law and Science of Expert Testimony*, Volume I, §3.4.1 at 29 (2002)(emphasis added).

**way[17].**

(**Exhibit 10**, pp. 44-46, 50-51). Dr. Sandmire testified that he has gone about trying to rule out "ascertainment bias" in the studies he relied upon by: "thinking about it." (**Exhibit 10**, p. 39).

**D. Dr. Sandmire's Novel Theory Has Not Been Peer Reviewed With Reliable Studies**

Daubert requires the Court to determine whether the theory or technique has been subject to peer review and publication. Submission to the scrutiny of the scientific community increases the likelihood that substantive flaws in methodology will be detected. Buckman v Bombardier Coporation, 893 F.Supp. 547, 554 (E.D.N.C. 1995). Dr. Sandmire's novel theory relies upon, **by his own admission**, work that he does not consider reliable, including his own work (**Exhibit 10**, pp 17-18). Dr. Sandmire testified that he reviewed the statistical significance of the articles he relied upon to eliminate chance. (**Exhibit 10**, p. 20). Unfortunately, Dr. Sandmire does not recall taking any advanced course work in statistics nor does he hold a masters in public health (**Exhibit 10**, p. 84). Although he claims to have an interest in epidemiology he does not know who the leaders in the field are, including Sir Austin Bradford Hill[18]. (**Exhibit 10**, p. 18)

***E. There Are No Standards Controlling The Technique Relied Upon By Dr. Sandmire***

[17] This is an admission that Dr. Sandmire has not stated a conclusion that can be evaluated independently by others as required by the scientific method.

[18] Sir Austin Bradford Hill was a world renowned medical statistician and epidemiologist who was the first to demonstrate the connection between cigarette smoking and lung cancer.

*Daubert, supra*, made it clear that one the factors to be taken into account when assessing the reliability of an expert's methodology is whether there are standards controlling the technique's operation. In the case of Dr. Sandmire's methodology, the technique at issue is the application of traction during delivery and Dr. Sandmire's inability to quantify the lack of standards with his own novel maternal propulsive forces injury causation theory.

Dr. Sandmire could not quantify the amount of traction utilized by Dr. Bowman in delivery of the baby. (**Exhibit 10**, p. 21). Dr. Sandmire has not seen anywhere where a physician has given objective numbers regarding the amount of traction used. (**Exhibit 10**, p. 21). Dr. Sandmire admitted that there is no quantifiable standard for the use of traction, except in the sense of "the usual amount". (**Exhibit 10**, pp. 22-23). According to Dr. Sandmire, there is ***no objective, quantifiable standard*** for the use of "the usual amount" of traction. (**Exhibit 10**, pp. 22-23). In fact, Dr. Sandmire characterized "the usual amount" as subjective. (**Exhibit 10**, p. 87). Dr. Sandmire admitted that Dr. Bowman could have used excessive lateral traction, which he acknowledged would have been a breach of the standard of care. (**Exhibit 10**, pp. 37-38, 81). Dr. Sandmire could not quantify how much the brachial plexus for Bryce needed to be stretched to reach its threshold. (**Exhibit 10**, pp. 33-34). Dr. Sandmire also admitted that excessive lateral traction on the head during delivery is not within the standard of care. (**Exhibit 10**, p. 81). Dr. Sandmire agrees that the "gentle traction" is subjective. (**Exhibit 10**, p. 87).

Dr. Sandmire speculated that the brachial plexus needed to be stretched 20-25%

to reach its threshold then claimed to not know where he got the information from and alluded that maybe one of plaintiff's attorneys provided it to him[19]. (**Exhibit 10**, p. 33-34) Dr. Sandmire was not certain that the authors of the articles relied upon by him all used the same definition of shoulder dystocia. (**Exhibit 10**, p. 34). Dr. Sandmire admitted that it is possible that Dr. Bowman could have used excessive lateral traction. (**Exhibit 10**, pp. 37-38). Dr. Sandmire agreed that with respect to the literature cited by him, there are no known measurements of the time or place of injury in utero (Exhibit 10, p 38).

### *F. Dr. Sandmire's Theory Relies Upon An Unknown And Unquantifiable Potential Rate Of Error*

Dr. Sandmire agrees that brachial plexus injuries are more common following a shoulder dystocia than a spontaneous vaginal delivery. (**Exhibit 10** , p. 57). Dr. Sandmire acknowledged that when he is talking about "maternal propulsive force" he is talking about energy. (**Exhibit 10**, p. 67). Unfortunately, in spite of "talking about energy", Dr. Sandmire acknowledged that he has no interest in making energy calculations. (**Exhibit 10**, p. 67). Dr. Sandmire then made the stunning admission that all of the forces are absorbed by the birth canal. (**Exhibit 10**, pp. 71-72). In order for Sandmire's theory to be credible it would have to defy Newton's Laws of Physics.

In other words, there is no conclusion that can be drawn from the articles relied upon by Sandmire that can be objectively evaluated by others - violating the scientific method. Dr. Sandmire is not familiar with the work in the field that refutes his novel

---

[19] There have been no ex-parte conversations between plaintiff's counsel and Dr. Sandmire to prepare him for deposition to the best of plaintiff's counsel's recollection.

theories, thereby interjecting an unreasonable rate of error into his opinions. He testified that he has not read in whole or part numerous texts which discuss brachial plexus causation.[20] (**Exhibit 10**, pp. 75-78).

## CONCLUSION

In light of the foregoing it is clear that Dr. Sandmire's novel maternal propulsive forces injury causation theory should be precluded at trial.

Respectfully submitted,

s/Kevin C. Riddle

Kevin C. Riddle (MI Bar no. P57435)
Hilborn & Hilborn, P.C.
999 Haynes Street, Suite 205
Birmingham, Michigan 48009
(248) 642-8350 telephone
(248) 642-3016 fax
Kevin@hilbornlaw.com
Attorney for Plaintiffs

Dated: October 2, 2006

---

[20] Avery's Disease of the Newborn, 8th Edition (2005). "The mechanism of injury to the plexus is a forceful separation of the head from the shoulder by lateral bending of the neck with simultaneous shoulder depression during vaginal delivery. Id. at 1431 (**Exhibit 24**). Neonatal-Perinatal Medicine, 7th Edition, Vol. 1 (2002). Excessive traction on the shoulder in the delivery of the head may result in stretching of the plexus. The same injury may follow lateral traction of the head and neck away from one of the shoulders during an attempt to deliver the shoulders in a vertex presentation. More vigorous traction of the same nature will result in paralysis of the entire arm." Id. at 473 (**Exhibit 25** ). "Textbook of Pediatrics, 16th Edition (2000). These injuries occur . . . . when lateral traction is exerted on the head and neck during delivery of the shoulder in a vertex presentation . . . or when excessive traction is placed on the shoulders." Id. at 491. "Medicine of the Fetus and Mother, 2nd Edition (1999). During all these approaches, the basic principle of avoiding extensive lateral displacement of the cervical spine is important . . .Usually, nerve damage occurs when excessive lateral traction is placed on the fetal head in efforts to deliver the obstructed shoulders." Id. at 1517 (**Exhibit 26**).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:05-cv-00827-REB-PAC
Magistrate Judge Patricia A. Coan

---

BRYCE POTTER, a Minor by and through her parents and Next Friends, LAURA POTTER and TRISTAN POTTER, and LAURA POTTER and TRISTAN POTTER, Individually,

Plaintiffs,

-vs-

DEBRA H. BOWMAN, M.D. and HCA-HEALTH ONE, L.L.C., d/b/a SWEDISH MEDICAL CENTER,

Defendants.

---

**CERTIFICATE OF COMPLIANCE WITH COLORADO DISTRICT COURT RULE 7.1A**

---

______Plaintiffs' attorney avers that he has complied with Local Rule 7.1A by conferring with counsel for Defendant in regard to the substance of this Motion and was denied.

Respectfully submitted this 2nd day of October 2006:

s/Kevin C. Riddle
Kevin C. Riddle (MI Bar no. P57435)
Hilborn & Hilborn, P.C.
999 Haynes Street, Suite 205
Birmingham, Michigan 48009
(248) 642-8350 telephone
(248) 642-3016 fax
Kevin@hilbornlaw.com
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00827-REB-PAC

---

BRYCE POTTER, a Minor by and through her parents and Next Friends, LAURA POTTER and TRISTAN POTTER, and LAURA POTTER and TRISTAN POTTER, Individually,

Plaintiffs,

-vs-

DEBRA H. BOWMAN, M.D. and HCA-HEALTH ONE, L.L.C., d/b/a SWEDISH MEDICAL CENTER,

Defendants.

---

**CERTIFICATE OF SERVICE**

---

Kevin C. Riddle deposes and states that he is employed by Hilborn & Hilborn, P.C. and he hereby certified his assistant, Devin L. Berry, on **Monday, October 2, 2006**, to electronically file **Plaintiffs' "Daubert" Motion in Limine to Preclude Dr. Herbert Sandmire's Novel "Maternal Propulsive Forces" Injury Causation Theory With Supporting Memorandum, Certificate of Compliance** and **Certificate of Service** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following individuals:

Christopher Miller, Esq.
Miles Buckingham, Esq.
Barbara Gloglawicz, Esq.
Kennedy, Childs & Fogg, P.C.
1050 Seventeenth Street, Suite 2500
Denver, CO 80265-2080

Craig Adams, Esq.
Molly Patricia Tighe, Esq.
Dickinson, Prud'Homme, Adams & Ingram, LLP
730 Seventeenth Street, Suite 730
Denver, CO 80202

William C. Marlin, Esq.
Coppola & Marlin, P.C.
3010 East Sixth Avenue
Denver, Colorado 80206

s/Kevin C. Riddle

Kevin C. Riddle (MI Bar no. P57435)
Hilborn & Hilborn, P.C.
999 Haynes Street, Suite 205
Birmingham, Michigan 48009
(248) 642-8350 telephone
(248) 642-3016 fax
Kevin@hilbornlaw.com
Attorney for Plaintiffs

Dated: October 2, 2006