Case No. 1:05-cv-00827-REB-KLM Document 130-15 filed 10/02/06 USDC Colorado pg 1 of 15

THIRD EDITION



# OPERATIVE OBSTETRICS

EDITED BY

JOSEPH J. APUZZIO • ANTHONY M. VINTZILEOS • LESLIE IFFY

Taylor & Francis
Taylor & Francis Group

# Contents


List of Contributors viii
Preface xiii
Dedication and Acknowledgements xiv

1 Anatomy of the anterior abdominal wall, uterus, and pelvic organs 1
*Raymond F Gasser*

2 Topographic anatomy of the perineum, vulva, vagina, and surrounding structures 21
*Shamshad H Gilani*

3 Clinical pelvimetry 27
*Elaine K Diegmann and Rhonda Nichols*

4 First-trimester embryofetoscopy 33
*E Albert Reece and Anthony M Vintzileos*

5 Chorionic villus sampling 41
*Patrice ML Trauffer, Neil S Silverman, and Ronald J Wapner*

6 Amniocentesis 57
*Sriram C Perni and Frank A Chervenak*

7 Fetal transfusion 65
*Christopher R Harman*

8 Fetal reduction 83
*Mark I Evans, David W Britt, Doina Ciorica, and †John C Fletcher*

9 Spontaneous and indicated abortions 91
*Márta Gávai and Zoltán Papp*

10 Percutaneous intrauterine fetal shunting 109
*Sundeep G Keswani, R Douglas Wilson, and Mark P Johnson*

11 Cordocentesis 121
*Carl P Weiner*

12 Fetal endoscopic surgery and laser photocoagulation therapy 133
*Ursula F Harkness and Timothy M Crombleholme*

13 Fetal surgery 147
*Robert H Ball and Michael R Harrison*

14 Cervical insufficiency 157
*Vincenzo Berghella, Jason Baxter, and Michele Berghella*

15 Advanced extrauterine pregnancy 173
*Armando E Hernandez-Rey and Gerson Weiss*

16 Management of fetal malformations 181
*Lami Yeo, Howard JA Carp, and Josef Shalev*

17 Intrauterine fetal demise 201
*Wendy Kinzler and Anthony Vintzileos*

18 Antepartum hemorrhage 211
*Gábor Németh, Gerard Hansen, and György Bártfai*

19 Intrapartum fetal monitoring 223
*Yinka Oyelese*

20 Normal vaginal delivery 241
*Morton A Stenchever and Lisa N Gittens-Williams*

21 Shoulder dystocia 253
*Joseph Ramieri and Leslie Iffy*

22 Postpartum hemorrhage 265
*Akos Jakobovits and Jahir C Sama*

23 Forceps delivery 281
*Joseph J Rovinsky and Anthony Caggiano*

24 The vacuum extractor (Ventouse) for obstetric delivery 299
*David N Dhanraj and Michael S Baggish*

25 Fetal malpresentations 311
*Pierre F Lespinasse and Leslie Iffy*

26 Delivery of twins and higher-order multiples 323
*Isaac Blickstein and Louis G Keith*

27 Birth injuries 335
*Abraham Golan and Shimon Ginath*

28 Puerperal inversion of the uterus 349
*Watson A Bowes Jr and Peter T Watson*

29 Wound healing, sutures, knots, needles, drains, and instruments 357
*Jesús R Alvarez and Vijaya Ganesh*

30 Cesarean section 365
*Joseph J Apuzzio and Charbel G Salamon*

31 Prevention of surgical site infection 387
*Joseph J Apuzzio and Javier Garcia*

32 Anesthetic procedures in obstetrics 395
*Joel Mann Yarmush and Jonathan David Weinberg*

33 Invasive cardiovascular monitoring 405
*Joanie Hare-Morris and Brian Kirshon*

34 Trauma in pregnancy 417
*Jeffrey Hammond*

35 Surgery during pregnancy 425
*Asha G Bale, Steve H Kim, and Edwin A Deitch*

36 Urologic complications during pregnancy 441
*Stuart S Kesler, Neel Shah, and Jonathan J Hwang*

37 Management of malignant and premalignant lesions of the female genital tract during pregnancy 451
*Darlene G Gibbon, Wilberto Nieves-Neira, Allison Wagreich, and Lorna Rodriguez-Rodriguez*

38 Gestational trophoblastic neoplasia 467
*Jesús R Alvarez and Abdulla Al-Khan*

39 Quality of obstetric care: the medicolegal perspective 477
*Marlene Schwebel and Curtis L Cetrulo*

40 Patient safety 485
*Richard M Weinberg*

Index 495

# 21 Shoulder dystocia

Joseph Ramieri and Leslie Iffy

Shoulder dystocia has no generally accepted definition. According to the most widely used interpretation, the diagnosis is applicable 'when, in the absence of spontaneous expulsion of the fetus, the standard delivery procedure of gentle downward traction of the fetal head has failed to accomplish delivery'.[1] Based on the traditional British concept of midwifery, the definition of this entity is different in certain European countries[2,3] and some services in the USA.[4] According to this interpretation, interruption of the birthing process following the delivery of the head is a physiologic phenomenon which requires no intervention. Arrest of the shoulders is not deemed to have occurred, therefore, until and unless the next uterine contraction, that usually follows the emergence of the head within 2–3 minutes, has failed to expel the shoulders and the rest of the fetal body. Intrinsic to this concept is the understanding that retraction of the shoulders against the perineum ('turtle sign') is a part of the physiologic delivery process and only seldom a harbinger of arrest of the shoulders. The difference between these concepts is far reaching both conceptually and in terms of clinical implications. However, when the next contraction fails to expel the body, the diagnosis is considered established by all criteria. From that point on, there is little disagreement about the actions to be taken.[5–9]

## Rate of occurrence

The reported incidence of shoulder dystocia is 0.15–1.7% of all deliveries.[4,8–12] The more than 10-fold difference in range is an indication of the fact that the diagnosis is subjective and depends upon the training, experience, emotional stability, and state of mind of the person conducting the delivery. In those services where nonintervention until the next uterine contraction is the preferred approach, the reported incidence is low.[4]

Although the rate of cesarean sections has increased in the USA about fivefold during the last 50 years,[13,14] that of shoulder dystocia has not decreased. Instead, fetal injuries associated with this complication became the leading medicolegal threat for obstetricians.[12] Currently, approximately 40% of all malpractice litigations in the specialty involve claims associated with brachial plexus injuries.[15] Thus, along with premature delivery, fetal damage associated with arrest of the shoulders at birth is probably the most important unresolved problem in contemporary obstetrics.

## Etiology

A broad variety of conditions and circumstances conducive to arrest of the shoulders at birth have been identified. They can be divided into three categories (Tables 21.1–21.3).

Inadequacy of the pelvis can make vaginal delivery difficult or impossible. Reduction of the anteroposterior diameter (platypelloid pelvis), is particularly important. However, excessive size of the fetus may preclude its passage even through a pelvis which is adequate by definition. Fetopelvic disproportion may be caused by the fact that, under certain circumstances, the width of the shoulders exceeds the greatest diameter of the head. This situation may lead to arrest of the shoulders in the process of delivery.

Small maternal stature is often associated with diminished pelvic dimensions. By predisposing to increased fetal size, excessive weight gain during pregnancy is conducive to the inability of the shoulders to pass through the birth canal.[16] With regard to the role of pre-existing maternal obesity, literature data differ.[5,16,17] Although relatively seldom mentioned in the

**Table 21.1 Preconceptional risk factors for shoulder dystocia**

| |
|---|
| Small maternal stature |
| Narrow pelvis |
| Gross obesity |
| Large maternal birth weight |
| Past birth of child large for gestational age |
| Past history of shoulder dystocia |
| Family history of diabetes |
| Personal history of diabetes |
| Age above 35 without past childbirth |

**Table 21.2 Prenatal risk factors for shoulder dystocia**

| |
|---|
| Gestational diabetes |
| Borderline glucose tolerance |
| Fetus large for gestational age |
| Weight gain of 35 lbs (15.5 kg) or more during pregnancy |
| Postdatism or postmaturity |
| Preeclampsia |

**Table 21.3 Intrapartum risk factors for shoulder dystocia**

| |
|---|
| Protracted or arrested first stage of labor |
| Protracted or arrested second stage of labor |
| Prolonged second stage |
| Use of extraction instrument |
| Use of oxytocin |
| Conduction anesthesia |

literature, the mother's own birth weight is a useful predictor of that of her child and, thus, of the risk of arrest of the shoulders at delivery.[18]

Previous delivery of a large child is a risk factor for shoulder dystocia rather than reassurance about the woman's ability of giving birth to another big baby uneventfully. High recurrence rates have been reported after a preceding shoulder dystocia.[1] Family history of diabetes is a predisposing factor for gestational diabetes and, thus, another unfavorable prognostic factor.

It is a widespread misconception that the increased rate of postoperative complications in obese women warrants preferential delivery of morbidly obese gravidas by the vaginal route. In fact, there are data to indicate that the incidence of shoulder dystocia among grossly obese women may be almost 10-fold higher than in the general population.[19] Therefore, morbid obesity is a consideration for, rather than against, abdominal delivery.

Although it is a routine procedure in most teaching institutions, the need to screen all pregnant women by a glucose-loading test late in the second trimester of the pregnancy is still disputed.[20] As a result, a disturbingly high proportion of shoulder dystocia-related fetal injuries can be traced back to undiagnosed, uncontrolled, or inadequately controlled maternal diabetes.[21,22] There seems to be little justification, therefore, to replace routine testing of gravidas' glucose tolerance by some complex formula and calculate diabetic predisposition based on maternal age, race, body mass index, family history, and previous pregnancy outcome.

Minor degrees of glucose intolerance that do not fulfill the criteria for gestational diabetes still predispose to fetal macrosomia and its consequences.[23] Vice versa, excessive fetal weight gain can be avoided in the majority of diabetic patients by strict diet and, if necessary, by the use of insulin.[24]

It has been suggested that maternal weigh gain exceeding 35 lbs (15.5 kg) may increase the risk of large for gestational age fetal status by as much as 10-fold.[1] According to most, but not all[17] authorities, prolongation of the pregnancy beyond the expected date of confinement increases the fetal risk exponentially, since fetal weight exceeding 4000 g is almost twice as frequent at week 42 of the gestation as at week 40.[25] The fetal risk further increases because the rate of growth of the fetal body exceeds that of the head at and beyond term gestation. A difference of 1.6 cm or more between the chest and head circumferences and a ≥4.8-cm discrepancy between those of the shoulders and the head identify a kind of fetal macrosomia which is highly conducive to shoulder dystocia at birth.[26,27] A discrepancy of ≥1.4 cm or more between the diameters of the fetal trunk and the head (biparietal diameter) has been found more predictive of a fetal weight exceeding 4000 g than the actual demonstration of such fetal weight by the customary techniques.[28]

Although arrest of the shoulders may occur after a normal labor process and even with precipitated delivery, intrapartum complications predispose to shoulder dystocia. Protraction or arrest disorder during the first stage[29] can be found in its background with relative frequency. Even more important is a prolonged second stage or one associated with protraction or arrest disorder.[5,6,21,22]

Uterine stimulation with oxytocin is a suspected predisposing factor.[5,21] However, since its use is frequently prompted by the occurrence of protraction or arrest disorder, its role is difficult to determine with certainty. The same applies to conduction anesthesia, the administration of which frequently leads to the use of oxytocin.[1]

There is a close relationship between the delivery of the fetus by forceps or vacuum extractor and arrest of the shoulders at birth.[5,21,30,31] Since an important early paper specifically referred to 'midpelvic extractions',[5] contemporary papers frequently imply that only the, by now largely abandoned, midforceps and midvacuum extraction operations are predisposing. In fact, at the time of the publication of the quoted paper, the term 'midpelvic extraction' incorporated those procedures that, on the basis of a recent reclassification,[32] are now referred to as low-forceps and low-vacuum extractions. Similar confusion has derived from the redefinition of the term 'macrosomia',[33] indicating a birth weight of 4500 g versus the traditional definition of 4000 g.[34] Papers published after this reclassification usually interpreted the term as a body weight exceeding 4500 g. Actually, writers who referred to 'macrosomia' prior to 1992 implied a weight exceeding 4000 g.[5] These misleading byproducts of well-intentioned innovations need to be kept in mind. Contemporary authors often misinterpret old literature data.

There is general agreement that the use of extraction instruments increases the risk of shoulder dystocia. However, opinions vary with regard to the magnitude of the increase of the risk from as little as 1.4-fold[17] to as much as 10–17-fold.[6,21,31] The wide difference among various estimates may be due to the fact that they are often used in cases of protracted or arrested second stage, complications that are conducive themselves to arrest of the shoulders at birth. Whereas the use of any kind of

extraction instrument predisposes to shoulder dystocia, sequential application of vacuum extractor and forceps, in any order, increases the risk exponentially.[21,31] Since they are conducive to protracted labor, malrotation, deflexion, and asynclitism of the fetal head have similar effect.

## Pathologic mechanisms of arrest of the shoulders

The introduction of radiographic pelvimetry into clinical practice contributed to the understanding of the fetopelvic relationship during the labor process.[35] Recognition of the fetal risks associated with exposure to irradiation largely removed diagnostic radiographic techniques from contemporary obstetric practice. An untoward effect of this development has been the loss of obstetricians' interest in the physiology of the labor and delivery process.[36]

Rarely, the natural forces fail to accomplish the expulsion of the body because, after its rotation, the anterior shoulder comes into collision with the pubic bone. Various technical procedures, to be described later, have been designed to overcome this particular situation, the classical clinical picture of shoulder dystocia. The use of traction or any other maneuver prior to the external rotation of the head is counterproductive, since the shoulders are not yet ready to pass through the midpelvis. Aware of the above described mechanism, British obstetricians refrain from intervention until the rotation of the shoulders has been completed. This often requires one more contraction and, thus, waiting for about 2–3 minutes.[2,3]

Some obstetricians, unmindful of the normal mechanism of labor, equate the turtle sign with the diagnosis of shoulder dystocia. Thus, they utilize traction under the erroneous impression that, once the head has been delivered, the fetus is in immediate danger. Actually, the child is not imperiled at this time.[37,38] If left alone, babies delivered by the process of 'two-step delivery'[36] are born in excellent condition. Cord around the neck, even if wrapped twice,[39] is less of a problem than complete disruption of the fetoplacental circulation. Therefore, clamping and cutting of the umbilical cord prior to the delivery of the shoulders is strongly discouraged. Implementation of this technique entailed catastrophic consequences in those instances when, following the severance of the cord, arrest of the shoulders had prevented prompt extraction of the body.[40]

Meconium staining of the amniotic fluid is not an indication for rapid extraction of the fetus from the birth canal. The next uterine contraction that follows the delivery of the head, before expelling the body of the child, squeezes a large amount of fluid out of the lungs[39] (Figure 21.1). Therefore, 'two-step delivery' may prevent or reduce the severity of meconium aspiration.



**Figure 21.1** Mechanism of normal 'two-step' delivery. After the emergence of the head, the cord around the neck was loosened. No attempt was made to deliver the body until the occurrence of the next uterine contraction. The picture was taken during the onset of the next contraction. It depicts an important effect of the contraction: the expression of a substantial amount of mucus (arrow) from the respiratory tract. The cord complication was anticipated because of variable fetal heart rate decelerations documented on external fetal monitoring. (By the courtesy of Dr Vivic Johnson.)

## Prediction and prevention

Over 10 years ago, the problem of shoulder dystocia was summarized in a publication as follows: 'Most of the traditional risk factors for shoulder dystocia have no predictive value, shoulder dystocia itself is an unpredictable event, and infants at risk of permanent injury are virtually impossible to predict. Thus, no protocol should serve to substitute for clinical judgment.'[41]

This defeatist philosophy was repeated in some publications,[42–44] often with the implication that the terms 'prediction' and 'prevention' are interchangeable. Actually, preventive medicine has seldom relied on prediction. The elimination of devastating diseases, such as smallpox, tuberculosis, and puerperal fever, and the teratogenic effects of drugs did not hinge upon prospective identification of individuals who would contract a particular infection or would suffer from the untoward effect of a potentially teratogenic agent. Thus, the numerous publications that confirmed and reconfirmed the unpredictability of shoulder dystocia have not helped to decrease the number of fetal injuries. Instead, orthopedic centers specializing in the surgical repair of Erb's palsy have mushroomed in the USA in recent years.

The fatalistic belief in the unpredictability of shoulder dystocia appears to have derived from two major considerations:

(1) The perceived difficulty of detecting macrosomia reliably by sonography.
(2) Mathematical calculations that claimed that an inordinate number of cesarean sections would be needed to reduce the rate of brachial plexus injuries.[45,46]

Intrinsic to the first argument has been the concern that sonography may overestimate the fetal weight, coupled with lack of attention to the fact that, by an equal chance, it can underestimate it. The philosophy that sonographic assessment of fetal weight at term is unacceptably unreliable is not shared by many prominent experts. Langer and associates calculated that, using an estimated fetal weight threshold of 4250 g as an indication for abdominal delivery for diabetic women, 76% of diabetes-related brachial plexus injuries could be prevented.[47] It is interesting, furthermore, that, with due recognition of its limitations, sonographic estimation of the fetal weight has been relied upon in many clinical situations, ranging from the determination of the expected date of confinement to detection of fetal growth retardation and the diagnosis of discordance between twins.

As for the mathematical calculation suggesting that 2335 cesarean sections would be needed to prevent one brachial plexus injury,[45,46] one need only remember that the generally quoted rate of arrest of the shoulders at birth is about 1% in the USA.[6,12] Of these babies, approximately 7% die or suffer permanent injury.[5,48] Thus, out of 1500 infants delivered vaginally, one becomes damaged due to arrests of the shoulders. Accordingly, one does not have to be a statistician to recognize that the quoted calculation is grossly inaccurate. Besides, this and other estimations ignore the fact that what needs to be prevented is not the shoulder dystocia but the fetal injuries deriving from it.

## Management of delivery

The delivery of the head without the rest of the body does not cause immediate fetal compromise. Textbooks and other publications have emphasized for decades that delivery in the course of two separate uterine contractions is not a pathologic phenomenon.[2–4,37,39,49,50] The fact that the face of the fetus turns blue during the intervening time may be unnerving for the uninitiated.[49] The anxiety soon evaporates, however, when the next contraction expels the child in vigorous condition.[39]

Contemporary practice standards permit the use of manipulative techniques to facilitate the delivery of the fetal body. However, they must be used with due attention to the physiology of the birthing process. Actions that are not in synchrony with the latter are counterproductive. It is critically important to avoid strong traction. The majority of brachial plexus injuries involve extraction of the child's body within 3 minutes of the delivery of the head, that is, before the end of the next uterine contraction.[22] Traction is not useful until the external rotation of the head has been completed. Thereafter, if utilized at all, it must be unerringly gentle. It is a useful technique to give support to the posterior parietal bone as pulsion is made upon the anterior mandibular region. This method maintains the axis of the cervical spine as close as possible to that of the thoracic spine, thus avoiding stretching of the brachial plexus.

Ideally, the preparations for possible shoulder dystocia should begin before the delivery of the head. If the patient is not already in the lithotomy position, or if the delivery begins with the mother on a labor bed, the patient must be placed immediately at the edge of the table or that of the bed with her legs held in stirrups or supported by two assistants, as circumstances permit. After the emergence of the head, intravenous infusion, or increase of the rate of flow, of oxytocin is contributory to development of effective uterine contractions for the expulsion of the body from the birth canal.

Sharp hyperflexion of the patient's legs against her abdomen had been found useful for facilitating the delivery long before McRoberts re-emphasized its importance.[50,51] Traditionally, it was used only during contraction. Thus, cooperative parturients, laboring without conduction anesthesia, could implement it without any assistance (Figure 21.2). Under the circumstances of threatening or existing shoulder dystocia, this position needs to be maintained for a prolonged period of time. Therefore, it requires two assistants. The position aligns the sacrum with the lumbar spine and rotates the symphysis pubis to a blunt angle, thus facilitating the passage of the shoulder underneath. According to one report, in the course of more than 5000 deliveries, the McRoberts maneuver alone resolved all cases of shoulder dystocia without the use of any other technique.[52] Essentially, this finding confirms that nonintervention until the next uterine contraction drastically reduces the occurrence of serious shoulder dystocia.[4,36]

Often, the uterine contraction continues after the delivery of the head. If so, it rotates the shoulders into the anteroposte-



**Figure 21.2** Before the routine use of conduction anesthesia, self-implemented hyperflexion of the legs by the parturient was a routine delivery position. In contemporary practice, when used for the management of shoulder dystocia, the legs must be supported by two assistants. (From O'Leary JA. Shoulder Dystocia and Birth Injury. McGraw-Hill: New York, 1992.)

rior diameter of the pelvis. At this point, gentle traction at an angle of about 30° under the horizontal, supported by suprapubic pressure, may facilitate the delivery of the body. Suprapubic pressure is generally applied by an assistant. With one or two fists or the palms of the hands immediately over the symphysis pubis, the anterior shoulder is depressed with a lateral bias toward the infant's face to facilitate rotation of the shoulders into the oblique diameter in order to allow its passage under the pubic arch. For effective use of this approach, the bladder must be empty. Ideally, bearing-down effort by the mother, suprapubic pressure by the assistant, and light traction by the accoucheur should be applied simultaneously. This well-orchestrated effort must be pursued with awareness of the fact that delivery of the head and the body during the same uterine contraction is not necessary.

After the delivery of the head, the next uterine contraction may be slightly delayed. This time offers an opportunity for optimizing the effect of the next one. The mother can be placed into a favorable position for delivery and the assistants can move to the sides of the parturient. Meanwhile, the accoucheur can suction the mouth and nose of the child and check for nuchal cord. When present, it should be eased around the head of the fetus if it can be done without difficulty. Causing avulsion of the cord at its umbilical insertion can lead to catastrophe. Besides, its handling can reduce the still existing circulation through the umbilical vessels. Facilitated by the McRoberts maneuver, with suprapubic pressure (Figure 21.3) and gentle downward traction, but most of the time even without, the next contraction expels the shoulders and then the body of the fetus.



Figure 21.3 Application of suprapubic pressure. (From O'Leary JA. Shoulder Dystocia and Birth Injury. McGraw-Hill: New York, 1992.)

Fundal pressure has been shown to be counterproductive and detrimental to the fetus.[53] Therefore, with one bizarre exception,[54] the contemporary literature discourages its use for the purpose of overcoming shoulder dystocia.[1,6,7,55]

A strong consensus supports the view that extensive episiotomy is one of the most effective measures for overcoming shoulder dystocia.[1,6,55] This opinion is not inconsistent with the expediency that delivery of the shoulders can be accomplished over an intact perineum or a routine episiotomy in the majority of the instances.[7] However, the cutting of a deep (third-degree mediolateral or fourth-degree median) episiotomy should precede strong traction invariably.

The corkscrew maneuver, introduced by Woods,[56] was designed to overcome the collision between the symphysis and the anterior shoulder. Since rotational movement is more likely to allow easy removal of a cork from a neck of the bottle than simple pull, he recommended manual rotation of the shoulders. In this process, pressure is applied against the clavicle and the scapula or against the anterior aspect of the upper arm (Figure 21.4). This effort should remove the shoulder from its locked position and allow its passage somewhat laterally under the ramus pubis. Rubin's modification implies rotation from back to front with the opposite hand.[57] This author attributed significance to the fact that, whereas the Woods maneuver causes abduction of the posterior shoulder, his technique induces adduction, thus diminishing the transverse diameter of the shoulders.

Opinions vary about the efficacy of these rotational techniques. It is widely accepted, on the other hand, that delivery of the posterior arm, if performed successfully, is conducive to the passage of the shoulders within a short period of time. The critical and probably most difficult part of this technique is the insertion of the hand of the operator into the birth canal. Some authors consider general or conduction anesthesia necessary for



Figure 21.4 The corkscrew maneuver. The shoulders are rotated by applying pressure on the scapula and the clavicle. The head is not to be rotated! (From O'Leary JA. Shoulder Dystocia and Birth Injury. McGraw-Hill: New York, 1992.)

this maneuver. When the fetal back is turned to the left side, the operator's left hand is to be used. Vice versa, the right hand is needed if the back is turned to the right. Inserting the index finger around the elbow or the wrist, the operator grasps the lower arm of the child and delivers it in front of the chest. The delivery of the rest of the body is usually easy. If other-wise, the accoucheur may rotate the body of the child until the previously anterior shoulder is located posteriorly. Then, the same maneuver follows with the other hand.

The limiting time factor for safe vaginal delivery after the collision of the shoulder with the symphysis is the inevitable detachment of the placenta from its implantation site after much of the uterine contents has been expelled. When the placental separation will take place is impossible to predict. The experience with twin deliveries may be a practical guide, noting that abruption of the placenta seldom occurs less than 20 minutes after the delivery of the first twin, that is, after the expulsion of about one-half of the uterine contents. In the absence of intervention, the fetal condition does not change for a few minutes after the emergence of the head.[37] The rapid decline of the fetal blood pH described some decades ago[58] probably resulted from coincidental stressful manipulations. Nonetheless, since the subject does not offer itself to experimentation, there is no solid ground for challenging the belief that retention of the body for 10 or more minutes after the emergence of the head carries a substantial risk of neonatal death or neurologic damage. Rather than relying on any arbitrary time limit, it appears reasonable to place a scalp electrode onto the head of the fetus if shoulder dystocia persists and to avoid forceful intervention as long as the fetal heart rate remains reassuring, since physical trauma is conducive to shock.

In Australia and Africa, symphysiotomy (described elsewhere in this volume) is used routinely for the treatment of shoulder dystocia. Because injury to the maternal urethra and bladder is associated with this operation with relative frequency, it has gained little acceptance in the USA. In contrast, cephalic replacement, generally referred to as the Zavanelli maneuver, has created some interest. Having been promoted by O'Leary in recent years,[1] the technique is best described by his own words:

> (1) The head is replaced by utilizing constant but firm pressure on the occiput with the palm of the right hand so as to flex the head while depressing the posterior vaginal wall with the left hand; (2) the vertex is pushed as far cephalad as possible, usually to zero station, where it will remain without assistance; and (3) insertion of a Foley catheter is recommended after completion of the maneuver.

As for the role of the Zavanelli maneuver in contemporary obstetrics, the same author made the following recommendations:

> As a last resort in the management of shoulder dystocia, with cephalic replacement, tocolysis and abdominal delivery seem to offer the best outcome. This technique should only be used when continued persistence at vaginal manipulation would lead to a predictably poor outcome. If the infant has been damaged, the placenta separated, or profound hypoxia has occurred, it should not be attempted. At present, the technique is not recommended for routine use until more traditional procedures had failed.

It should be noted, however, that delay until the infant is moribund may be partially responsible for many of the poor outcomes associated with this maneuver.

Purposeful fracturing of the clavicle on the side of the impaction has been described as a practical technique for overcoming shoulder dystocia. While sound theoretically, the technique is difficult and particularly so in a macrosomic fetus whose bones are strong. Thus, it remains an approach which only a few practitioners dare to utilize.

An analysis by McCall, based on over 100 cases of shoulder dystocia-related birth injuries, drew attention to the fact that the fetal damage deriving from this complication is not restricted to brachial plexus injuries.[48] He found that 7% of the babies involved died and 20% suffered brain injury secondary to hypoxia or intracranial hemorrhage. Several later publications, based on fewer cases, denied the relationship between shoulder dystocia and central nervous system damage. However, more recent research, based on more than 200 shoulder dystocia-related birth injuries, found the rate of central nervous system injuries comparable to that reported by McCall. In this series, the rate of brachial plexus injuries was in excess of 90%.[21,22]

Most brachial plexus lesions noted at birth heal by the age of 6 months. However, when the neurologic deficit persists for 12 months, the damage is probably permanent.[59]

The frequency of injuries involving the upper trunk of the brachial plexus (segments C 5–7), often referred to as Erb–Duchenne palsy, is far higher than damage to the lower branches (C 7–T 1) (Klumpke type of palsy). The latter injury is unlikely to occur without the coincidental involvement of the upper trunks. Recently developed surgical techniques, often requiring multiple operative interventions, can bring about improvement in the function of the involved extremity, but no cure. Consequently, the injury predictably restricts the professional and vocational opportunities of the affected individual later in life.

## Controversies concerning etiology

Apart from being devastating for many of its victims, cases of shoulder dystocia have affected the professional lives of obstetricians also. Consequently, this entity has often been discussed in the medicolegal context.[6,17,21,22,41,42,44,45,54] In this process, a series of papers appeared recently, suggesting that, in many cases, brachial plexus injury is a prenatal event, unrelated to the arrest of the shoulders at birth.[60–65] Based on the information that evidence of denervation in adult subjects is not detectable by electromyography until 10–14 days after the insult, evidence

of denervation within a few days after birth in affected newborns was interpreted as proof that the injuries had been sustained *in utero* before the onset of labor. This concept had to be discarded when a pertinent study showed that neuromuscular deficits develop much faster in fetal than in adult pigs.[66] An alternative hypothesis, namely, that brachial plexus injury is frequently caused during the labor process by uterine forces, still prevails. However, since the maternal forces mobilized during labor and delivery are expulsive in nature, it is difficult to perceive a natural mechanism which could imitate the effect of traction injuries. The latter have been proven to be associated with forceful extraction of the shoulders.

Rare cases of brachial plexus lesion, attributed to spontaneous *in utero* injury, have been reported.[64,67,68] However, if *in utero* acquired Erb's palsy is relatively frequent, it should occur often among neonates delivered abdominally, since the rate of cesarean sections has been at the range of 25% during the last two decades. It is a matter of interest, therefore, that in a published series of over 200 brachial plexus injuries, only one of the affected children was delivered by (a repeat) cesarean section.[15] The delivery of a macrosomic baby had been preceded by two failed extraction attempts in that case and involved the Zavanelli maneuver. Thus, there is doubt whether even this single case can be attributed to forces other than those utilized during the delivery attempts. It appears reasonable to conclude, therefore, that, if it occurs at all, brachial plexus injury unrelated to the process of delivery is a rare phenomenon with little bearing upon the overall problem of shoulder dystocia at birth.

Intrauterine malposition has also been posited as a cause of brachial plexus injury. However, such an etiology would necessarily result in atrophic changes in the muscle innervated by the plexus at the time of birth.

## Prediction and prevention

The knowledge that most cases cannot be predicted[41] should not stop physicians from preventing as many incapacitating fetal injuries, deriving from shoulder dystocia, as possible. In most instances, this complication is not lightening out of the blue but the last stage of a process which can often be influenced by early recognition and careful elimination of factors conducive to this complication. An algorithm designed to show a path that offers a chance for preventing shoulder dystocia-related birth injuries is shown in Table 21.4.

While calculating the risk of shoulder dystocia in relation to birth weight in nondiabetic and diabetic women, various authors utilized a broad variety of approaches, endpoints, and interpretations.[69–72] The most extensive and probably most reliable data were published by Nesbitt et al[72] and were based upon the combined material of over 300 hospitals, involving more than half a million deliveries in the year 1992 (Table 21.5). In this material, diabetic mothers giving birth to 4000–4250-g babies experienced shoulder dystocia in about 8% of all instances. The rate increased to over 20% when the birth weights exceeded 4500 g. In nondiabetic patients, the fetal risks were comparable to those of infants of diabetic mothers who weighed 250 g less. The use of an extraction instrument increased the risk of arrest of the shoulders by approximately 40%.

Another study found that of those infants delivered under conditions of shoulder dystocia, 20% sustained injuries.[30] Among these, 30% suffered permanent neurologic or other deficits. These results are comparable with data deriving from other sources.[11] They permit the calculation, therefore, that approximately one out of 13 cases of shoulder dystocia entails permanent fetal sequelae.

The view that in macrosomia shoulder dystocia is not the only mechanism of fetal damage[69] needs to be remembered.

**Table 21.4 Algorithm for the prevention of shoulder dystocia**

| | |
|---|---|
| First encounter | History about the mother's own birth weight, personal and family history of diabetes, past delivery of child large for gestational age, and birth injury. (Glucola screening test if positive history is obtained.) |
| Examination | Attention to maternal weight (diet). Detailed pelvic assessment (to be documented in detail). |
| Prenatal visits | Close attention to weight gain. Involve nutritionist if needed. (In case of glucosuria: diabetic screening at any gestational length.) |
| 26–28 weeks | Routine diabetic screening (glucola test). If 135 mg/dl or more at 1 hour, arrange 3-hour glucose tolerance test promptly. If the blood glucose level is 190 mg/dl after 1 hour, the patient is gestational diabetic. No more testing is needed. |
| 36–40 weeks | Estimate fetal weight clinically at every visit. If large for gestational age fetus at term (≥3800 g) is suspected, double-check fetal weight with ultrasound. |
| Term | If estimated fetal weight is 4000 g or more, discuss delivery risks with the mother.* |

*See Table 21.5.

**Table 21.5 Incidence of shoulder dystocia in relation to fetal weight and maternal diabetic or nondiabetic status***

| Fetal weight extraction | Spontaneous delivery non-diabetic | Spontaneous delivery diabetic | Instrumental extraction nondiabetic | Instrumental diabetic |
|---|---|---|---|---|
| 3500–3750 g | 0.5% | 2.5% | 1.5% | 4% |
| 3750–4000 g | 2.5% | 5% | 3.5% | 8% |
| 4000–4250 g | 5% | 8% | 7.5% | 12% |
| 4250–4500 g | 8% | 13% | 12% | 16% |
| 4500–4750 g | 13% | 23% | 20% | 27% |
| 4750–5000 g | 21% | 29% | 23% | 35% |

*Based on data published by Nesbitt et al.[72]

Through multiple mechanisms, large fetal size is conducive to death and injury in a variety of ways.[73] Some of them are the consequence of protracted or arrested labor due to relative fetopelvic disproportion. In such cases, the maternal morbidity rate also is increased, as are the risks associated with those cesarean sections performed after arrested labor. Thus, the conflict between maternal and fetal interests is not always ircut.

A widely cited interpretation of the prevailing consensus,[74] quoting the investigations of Nesbitt et al,[72] concluded that elective cesarean section is only indicated in case of an estimated fetal weight of 5000 g. The data shown in Table 21.5 provide no basis for this opinion. Even less do they support the conclusion that 'suspected fetal macrosomia is not a contraindication to attempted vaginal birth after prior cesarean delivery'.

In the twenty-first century, the medical profession recognizes the right of women to choose delivery by elective cesarean section even in the absence of a medical indication. There is little justification, therefore, to substitute the preferences of medical practitioners or organizations for the choice of a well-informed patient. What kind of risk a mother is willing to accept for herself and for her child is a decision which only she can make. Doctors can guide the mother toward a reasonable choice but cannot be the final decision-making authority. Once the risks and benefits have been truthfully explained, most patients can and are willing to contribute to the formulation of a reasonable management plan.

## Conclusions

A - previously stated, there are several risk factors that increase chance of encountering shoulder dystocia. Most of these are associated with macrosomia, by far, the greatest single factor associated with this problem. It must be understood, however, that the majority of shoulder dystocias are unpredictable. Arrest of the shoulders may occur even in the absence of any attendant risk factor. Therefore, the obstetrician must always maintain vigilance with respect to its occurrence.

Because of the low incidence of this complication, very few graduating residents have seen or handled more than a few cases. When presented with a case of shoulder dystocia, the inexperienced obstetrician may panic and become confused, exerting unacceptable and maldirected forces upon the infant's head, and thus producing permanent brachial plexus injury.

The only cogent and practical way of developing experience is to use 'release' maneuvers and to practice these maneuvers over and over in cases where no shoulder dystocia is extant. Residents do not wait until they assist in surgical procedures to learn to tie knots, nor do they wait until a victim of a heart attack is encountered to practice cardiopulmonary resuscitation. The analogy is clear.

We recommend that both residents and experienced attending physicians have a 'drill' in mind, remembering that no single release maneuver has been proven superior to any other. Each maneuver has its place in a given situation and none can accomplish safe delivery in every case. We offer the following approach when the turtle sign presents itself, portending shoulder dystocia:

(1) Never clamp or cut the cord before the shoulders are released.
(2) Wait for the next contraction after the one that delivered the head. Very often, this contraction with exhausting effort will effect delivery because the shoulders have had a chance to rotate to the oblique or anteroposterior diameter. The obstetrician also has the time to take a deep breath and mentally rehearse his or her drill.
(3) If delivery is not forthcoming after the next contraction, maneuvers should be instituted:
    (a) *McRoberts*. The maternal thighs are flexed sharply toward the abdomen with personnel actively assisting on each side.
    (b) *Suprapubic pressure*. (Fundal pressure is to be avoided.) Suprapubic pressure should be executed by a nurse or an

assistant, using the heel of the hand or the fist. The anterior shoulder should be directed toward the infant's face. This Rubin modification of suprapubic pressure will help rotate the shoulder into the larger oblique diameter.

(c) *Rubin modification of Wood's maneuver.* Two fingers are inserted behind the anterior scapula, and rotation pressure exerted such that the anterior shoulder is being rotated toward the face while the assistant continues to apply lateral suprapubic pressure in the same direction.

(d) *Perform a generous episiotomy or episioproctotomy.* This alone will suffice to solve the problem in many situations. It will also give adequate room to insert the fingers posteriorily to effect the next maneuver.

(e) *Deliver the posterior arm.* This maneuver may be effected more efficaciously if the opposite hand is inserted along the infant's back until the elbow is reached. Posterior fingers involved beyond the elbow to the forearm may then be flexed to put the hand of the infant within reach of the obstetrician's grasp on the anterior side of the infant.

(f) *Hibbard maneuver.* While the posterior aspect of the infant's head is supported by the obstetrician's hand, strong pressure is exerted upon the junction of the anterior trapezoid muscle with the neck toward the hollow of the sacrum in an attempt to pass the anterior shoulder. A second rotational maneuver with suprapubic pressure should then be attempted.

(g) Unless the anterior shoulder has been freed, there should be no attempt to use traction upon the head in an attempt to release the shoulder. Once it is released, care must be taken to support the posterior aspect of the head with mild traction at an angle not to exceed 30º or, preferably, by pulsion from above made upon the infant's mandible and neck.

(4) If you do not have adequate assistance, ask for help! If a more experienced obstetrician is nearby, do not hesitate to seek his/her support!

These maneuvers must be executed deliberately but expeditiously. If all are ineffective, immediate transition to the Zavanelli maneuver may be considered. The infant's head is manually rotated to the OA position. Pressure is put upon the occiput with the dominant hand while the opposite is used as assistance to flex fully the infant's head. The vertex is then pushed up into the pelvis as high as possible and a Cesarean section performed as soon as possible. A tocolytic agent (we suggest terbutaline 0.25 mg) should be given as soon as the obstetrician has determined that the maneuver will be employed.

Points to remember:

(1) Wait for the contraction after the delivery of the head.
(2) Never exert downward traction upon the infant's head in the face of suspected shoulder dystocia.
(3) Perform each maneuver in a sequence which has been memorized and practiced many times.
(4) If it is utilized, incorporate the Zavanelli maneuver before severe hypoxia is present.
(5) Practice, practice, practice!

# References


1. O'Leary JA. Shoulder dystocia: prevention and treatment. In: Iffy L, Apuzzio JJ, Vintzileos AM (eds), Operative Obstetrics, p. 234–43. (2nd edition), McGraw-Hill: New York, 1992.
2. Roseveas SK, Stirrat GM. Handbook of Obstetric Management, pp. 251. Blackwell Science: Oxford, 1996.
3. Papp Z. A Szülészet-Nögyógyászat Tankönyve, p. 432. Semmelweis Kiadó: Budapest, 1999.
4. Iffy L. Shoulder dystocia. Am J Obstet Gynecol 1987; 156: 1416.
5. Benedetti TJ, Gabbe SG. Shoulder dystocia. A complication of fetal macrosomia and prolonged second stage of labor with mid-pelvic delivery. Obstet Gynecol 1978; 52: 526–9.
6. O'Leary JA. Shoulder Dystocia and Birth Injury. McGraw-Hill: New York, 1992.
7. Cunningham FG, Gant FN, Leveno K et al. Williams' Obstetrics (21st edition). McGraw-Hill: New York, 2001 pp. 459–64.
8. Lanni SM, Seeds JW. Malpresentations. In: Gabbe SG, Niebyl JR, Simpson JL (eds), Obstetrics p. 473 (4th edition). Churchill Livingstone: New York, 2002.
9. Bowes WA Jr. Clinical aspects of normal and abnormal labor. In: Creasy RK, Resnik R (eds), Maternal-Fetal Medicine, p. 532 (4th edition). WB Saunders Co: Philadelphia, 1999.
10. Hardy AE. Birth injuries of the brachial plexus. J Bone Joint Surg 1981; 63: 98–101.
11. Hopwood HG. Shoulder dystocia: fifteen years' experience in a community hospital. Am J Obstet Gynecol 1982; 144: 162–6.
12. Gross TL, Sokol RJ, Williams T et al. Shoulder dystocia: a fetal-physician risk. Am J Obstet Gynecol 1987; 156: 1408–18.
13. Nimmo RA, Murphy GA, Adhate A et al. Factors affecting perinatal mortality in an urban center. Natl Med Assoc J 1991; 83: 147.
14. ACOG Committee Opinion No. 179, November 1996.
15. Iffy L, Djordjevic MM, Apuzzio JJ et al. Diabetes, hypertension and birth injuries: a complex interrelationship. Bull Isr Soc Obstet Gynecol 2004; 2: 36.
16. Sama J, Iffy L. Maternal weight and fetal injury at birth. Med Law 1998; 17: 61–8.
17. Robinson H, Tkatch S, Mayes DC et al. Is maternal obesity a predictor of shoulder dystocia? Obstet Gynecol 2003; 101: 24–7.
18. Klebanoff MA, Mills JL, Berendes HW. Mother's birth weight as a predictor of macrosomia. Am J Obstet Gynecol 1985; 153: 353–7.
19. Johnstone NR. Shoulder dystocia: a study of 47 cases. Aust N Z J Obstet Gynaecol 1979; 19: 28–31.
20. ACOG Technical Bulletin. Fetal macrosomia. 1991; No. 159.
21. Iffy L, Váradi V, Jakobovits A. Common intrapartum denominators of shoulder dystocia related birth injuries. Zentralbl Gynakol 1994; 116: 33–7.

22. Iffy L, Váradi V. A vállak elkadásával kapcsolatos magzati sérülések kóroki tényezöi. Magy Noorv Lap 2001; 64: 365.
23. Lindsay MK, Graves W, Klein L. The relationship of one abnormal glucose tolerance test value and pregnancy complications. Obstet Gynecol 1989; 73: 103–6.
24. Coustan DR, Imrah J. Prophylactic insulin treatment of gestational diabetes reduces the incidence of macrosomia, operative delivery, and birth trauma. Am J Obstet Gynecol 1984; 150: 836–42.
25. Boyd ME, Usher RH, McLean FH. Fetal macrosomia: prediction, risks, proposed management. Obstet Gynecol 1983; 61: 715–22.
26. Modanlou HD, Komatsu G, Dorchester W et al. Large for gestational age neonates: anthropometric reasons for shoulder dystocia. Obstet Gynecol 1982; 60: 417–23.
27. Harris BA Jr. Shoulder dystocia. Clin Obstet Gynecol 1984; 27: 106–11.
28. Wladimiroff JW, Bloemsma CA, Wollenburg HCS. Ultrasonic diagnosis of the large-for-dates infant. Obstet Gynecol 1978; 52: 285–8.
29. Friedman EA. Labor: Clinical Evaluation and Management (2nd edition). Appleton-Century-Crofts: New York, 1978.
30. Benedetti TJ: Managing shoulder dystocia. Contemp Ob Gyn 1979; 14: 33.
31. Benedetti TJ. Birth injury secondary to shoulder dystocia. In: Report of the 93rd Ross Conference, Columbus, Ohio, Ross Laboratories, 1987.
32. ACOG Technical Bulletin. Operative vaginal delivery. No. 196, August 1994.
33. ACOG Technical Bulletin. Fetal macrosomia. No. 159, September 1991.
34. Manning S. General principles and applications of ultrasonography. In: Creasy RK, Resnik R (eds), Maternal-Fetal Medicine, pp. 169, 183 (4th edition). W.B. Saunders: Philadelphia, 1999.
35. Mengert WF. Pelvic measurements of 4144 Iowa women. Am J Obstet Gynecol 1938; 36: 260.
36. Iffy L, Apuzzio J, Ganesh V. A randomized controlled trial of prophylactic maneuvers to reduce head-to-body delivery time in patients at risk for shoulder dystocia. Obstet Gynecol 2003; 102: 1089–90.
37. Stallings SP, Edwards RK, Johnson JWC. Correlation of head-to-body delivery intervals in shoulder dystocia and umbilical artery acidosis. Am J Obstet Gynecol 2001; 185: 268–74.
38. Harris DA Jr. Shoulder dystocia. The Female Patient. 1990; 15: 69–76.
39. Bottoms SF, Sokol RJ. Mechanisms and conduct of labor. In: Iffy L, Kaminetzky HA (eds), Principles and Practice of Obstetrics & Perinatology, p. 815. Wiley: New York, 1981.
40. Iffy L, Váradi V, Papp E. Untoward neonatal sequelae deriving from cutting the umbilical cord before delivery. Med Law 2001; 20: 627–34.
41. Nocon JJ, McKenzie DK, Thomas LJ, Hansell RS. Shoulder dystocia: an analysis of risks and obstetrics maneuvers. Am J Obstet Gynecol 1993; 168: 1732–7.
42. ACOG Practice Bulletin. Fetal macrosomia. No. 22 (November) 2000.
43. Bryant DR, Leonardi MR, Landwehr JB, Bottoms SF. Limited usefulness of fetal weight in predicting neonatal brachial plexus injury. Am J Obstet Gynecol 1998; 179: 686–9.
44. Donnelly V, Foran A, Murphy J et al. Neonatal brachial plexus palsy: an unpredictable injury. Am J Obstet Gynecol 2002; 187: 1209–12.
45. ACOG Practice Patterns: Shoulder dystocia. No. 7 (October) 1997.
46. Rouse DJ, Owen J, Goldenberg RL et al. The effectiveness and costs of elective cesarean delivery for fetal macrosomia diagnosed by ultrasound. JAMA 1996; 276: 1480–6.
47. Langer O, Berkus MD, Huff RW et al. Shoulder dystocia: should the fetus weighing ≥4,000 gm be delivered by cesarean section? Am J Obstet Gynecol 1991; 165: 831–7.
48. McCall JO Jr. Shoulder dystocia. A study of after effects. Am J Obstet Gynecol 1962; 83: 1486.
49. Eastman NJ, Hellman LM. Williams' Obstetrics, p. 423 (11th edition). Appleton-Century-Crofts: New York, 1961.
50. Greenhill JP. Obstetrics, p. 278 (11th edition). WB Saunders: Philadelphia, 1955.
51. McRoberts WA. Maneuvers for shoulder dystocia. Contemp Obstet Gynecol 1984; 24: 17.
52. Smeltzer JS. Prevention and management of shoulder dystocia. Clin Obstet Gynecol 1986; 29: 299–308.
53. Gross SJ, Shime J, Farine D. Shoulder dystocia: predictors and outcome. Am J Obstet Gynecol 1987; 156: 334–6.
54. Sandmire HS. From Green Bay a game plan for shoulder dystocia. OBG Management (April) 1997, p 15.
55. Benedetti TJ. Shoulder dystocia. In: Pauerstein CJ (ed.), Clinical Obstetrics, p. 871. Wiley: New York, 1987.
56. Woods CE. A principle of physics as applicable to shoulder delivery. Am J Obstet Gynecol 1943; 45: 796–804.
57. Rubin A. Management of shoulder dystocia. JAMA 1964; 189: 835–7.
58. Wood C, Ng KH, Hounslow D et al. Time: an important variable in normal delivery. J Obstet Gynaecol Br Commonw 1973; 80: 295.
59. Volpe JJ. Neurology of the Newborn, p. 781 (3rd edition). WB Saunders: Philadelphia, 1995.
60. Jennett RJ, Tarby TJ. Disuse osteoporosis as evidence of brachial plexus palsy due to intrauterine fetal maladaptation. Am J Obstet Gynecol 2001; 185: 236–7.
61. Gonik B, Zhang N, Grimm NG. Prediction of brachial plexus stretching during shoulder dystocia using a computer stimulation model. Am J Obstet Gynecol 2003; 189: 1168–72.
62. Ouzounian JG, Korst LM, Phelan JP. Permanent Erb palsy: a traction-related injury? Obstet Gynecol 1997; 89: 139–41.
63. Gherman RB, Ouzounian JG, Miller DA et al. Spontaneous vaginal delivery: a risk factor for Erb's palsy? Am J Obstet Gynecol 1998; 178: 423–7.
64. Dunn DW, Engle WA. Brachial plexus palsy: intrauterine onset. Pediatr Neurol 1985; 1: 367–9.
65. Koenigsberger MR. Brachial plexus palsy at birth: intrauterine or due to delivery trauma? Ann Neurol 1980; 8: 228.

Case No. 1:05-cv-00827-REB-KLM Document 130-15 filed 10/02/06 USDC Colorado pg 15 of 15



66. Gonik B, McCormick EM, Verweij BH et al. The timing of congenital brachial plexus injury: a study of electromyography findings in the newborn piglets. Am J Obstet Gynecol 1998; 178: 688–95.
67. Dunn DW, Engle WA. Brachial plexus palsy: intrauterine onset. Pediatr Neurol 1985; 1: 376.
68. Eng GE. Neuromuscular disease. In: Avery GB, Fletcher MA, MacDonald MG. Neonatology, pp. 1164, 1166 (4th edition). JB Lippincott: Philadelphia, 1994.
69. Modanlou HD, Dorchester WL, Phorosian A et al. Macrosomia – maternal, fetal, and neonatal implications. Obstet Gynecol 1980; 55: 420–4.
70. Spellacy WN, Miller S, Winegar A et al. Macrosomia – maternal characteristics and infant complications. Obstet Gynecol 1985; 66: 158–61.
71. McFarland LV, Raskin M, Daling JR et al. Erb/Duchenne's palsy: a consequence of fetal macrosomia and method of delivery. Obstet Gynecol 1986; 68: 784–8.
72. Nesbitt TS, Gilbert WM, Herrchen B. Shoulder dystocia and associated risk factors with macrosomic infants born in California. Am J Obstet Gynecol 1998; 179: 476–80.
73. Sack RA. The large infant. Am J Obstet Gynecol 1969; 104: 195–204.
74. American Academy of Pediatrics and the American College of Obstetricians and Gynecologists: Guidelines for Perinatal Care (5th edition). Washington, DC, 2002.