Case No. 1:05-cv-00827-REB-KLM Document 130-29 filed 10/02/06 USDC Colorado pg 1 of 6

21ST EDITION

# Williams Obstetrics

F. GARY CUNNINGHAM

NORMAN F. GANT

KENNETH J. LEVENO

LARRY C. GILSTRAP III

JOHN C. HAUTH

KATHARINE D. WENSTROM

Case No. 1:05-cv-00827-REB-KLM Document 130-29 filed 10/02/06 USDC Colorado pg 2 of 6

# Contents

*Preface* ix

SECTION I. HUMAN PREGNANCY 1

1. Obstetrics in Broad Perspective 3
2. Pregnancy: Overview, Organization, and Diagnosis 15
3. Anatomy of the Reproductive Tract 31

SECTION II. PHYSIOLOGY OF PREGNANCY 63

4. The Endometrium and Decidua: Menstruation and Pregnancy 65
5. The Placenta and Fetal Membranes 85
6. The Placental Hormones 109
7. Fetal Growth and Development 129
8. Maternal Adaptations to Pregnancy 167

SECTION III. PREGNANCY PLANNING AND ANTEPARTUM MANAGEMENT 201

9. Preconceptional Counseling 203
10. Prenatal Care 221

SECTION IV. NORMAL LABOR AND DELIVERY 249

11. Parturition 251
12. Mechanisms of Normal Labor 291
13. Conduct of Normal Labor and Delivery 309
14. Intrapartum Assessment 331
15. Analgesia and Anesthesia 361
16. The Newborn Infant 385
17. The Puerperium 403

SECTION V. ABNORMAL LABOR 423

18. Dystocia: Abnormal Labor and Fetopelvic Disproportion 425
19. Dystocia: Abnormal Presentation, Position, and Development of the Fetus 451
20. Induction and Augmentation of Labor 469

SECTION VI. OPERATIVE OBSTETRICS 483

21. Forceps Delivery and Vacuum Extraction 485
22. Breech Presentation and Delivery 509
23. Cesarean Section and Postpartum Hysterectomy 537

SECTION VII. COMMON COMPLICATIONS OF PREGNANCY 565

24. Hypertensive Disorders in Pregnancy 567
25. Obstetrical Hemorrhage 619
26. Puerperal Infection 671
27. Preterm Birth 689
28. Postterm Pregnancy 729
29. Fetal Growth Disorders 743
30. Multifetal Pregnancy 765

SECTION VIII. PLACENTAL DISORDERS 811

31. Abnormalities of the Fetal Membranes and Amnionic Fluid 813

Case No. 1:05-cv-00827-REB-KLM Document 130-29 filed 10/02/06 USDC Colorado pg 3 of 6



32. Diseases and Abnormalities of the Placenta 827

SECTION IX. REPRODUCTIVE SUCCESS AND FAILURE 853

33. Abortion 855
34. Ectopic Pregnancy 883
35. Abnormalities of the Reproductive Tract 911

SECTION X. FETAL ABNORMALITIES: INHERITED AND ACQUIRED DISORDERS 937

36. Genetics 939
37. Prenatal Diagnosis and Fetal Therapy 973
38. Teratology, Drugs, and Medications 1005
39. Diseases and Injuries of the Fetus and Newborn 1039

SECTION XI. TECHNIQUES USED TO ASSESS FETAL HEALTH 1093

40. Antepartum Assessment 1095
41. Ultrasound and Doppler 1111

SECTION XII. MEDICAL AND SURGICAL COMPLICATIONS IN PREGNANCY 1141

42. General Considerations and Maternal Evaluation 1143
43. Critical Care and Trauma 1159
44. Cardiovascular Diseases 1181
45. Chronic Hypertension 1209
46. Pulmonary Disorders 1223
47. Renal and Urinary Tract Disorders 1251
48. Gastrointestinal Disorders 1273
49. Hematological Disorders 1307
50. Endocrine Disorders 1339
51. Diabetes 1359
52. Connective-Tissue Disorders 1383
53. Neurological and Psychiatric Disorders 1405
54. Dermatological Disorders 1429
55. Neoplastic Diseases 1439
56. Infections 1461
57. Sexually Transmitted Diseases 1485

SECTION XIII. FAMILY PLANNING 1515

58. Contraception 1517
59. Sterilization 1555

*Index* 1563

V

SECTION

# *Abnormal Labor*

shoulder dystocia is due in part to increased attention to its appropriate documentation (Nocon and co-workers, 1993).

Use of maneuvers to define shoulder dystocia has been criticized (Beall and associates, 1998; Spong and colleagues, 1995). In deliveries in which shoulder dystocia is anticipated, one or more maneuvers may be used prophylactically, but no diagnosis of shoulder dystocia is recorded. In other cases, one or two maneuvers may be used with rapid resolution of shoulder dystocia and excellent outcome, and the diagnosis is not identified. Spong and colleagues (1995) attempted to more objectively define shoulder dystocia by witnessing 250 unselected deliveries and timing intervals from delivery of the head, to delivery of the shoulders, and to completion of the birth. The incidence defined by the use of obstetrical maneuvers was higher than previously reported (11 percent); however, only about half of these were diagnosed by the clinicians. The mean head-to-body delivery time in normal births was 24 seconds compared with 79 seconds in those with shoulder dystocia. They proposed that a head-to-body delivery time exceeding 60 seconds be used to define shoulder dystocia.

**MATERNAL CONSEQUENCES.** Postpartum hemorrhage, usually from uterine atony, but also from vaginal and cervical lacerations, is the major maternal risk (Benedetti and Gabbe, 1978; Parks and Ziel, 1978). Puerperal infection following cesarean delivery also remains a problem.

**FETAL CONSEQUENCES.** Shoulder dystocia may be associated with significant fetal morbidity and even mortality. Gherman and co-workers (1998) reviewed 285 cases of shoulder dystocia and 25 percent were associated with fetal injuries. Transient brachial plexus palsies were the most common injury, accounting for two thirds; 38 percent had clavicular fractures, and 17 percent sustained humeral fractures. There was one neonatal death, and four infants had persistent brachial plexus injuries. In this series, almost half of the cases of shoulder dystocia required a direct fetal manipulation such as the Woods maneuver, in addition to the McRoberts procedure, to effect release of the impacted shoulders. Direct fetal manipulation, however, when compared with use of the McRoberts procedure alone, was not associated with an increased rate of fetal injury.

***BRACHIAL PLEXUS INJURY.*** Injury to the brachial plexus may be localized to the upper or lower part of the plexus (Chap. 39, p. 1080). It usually results from downward traction on the brachial plexus during delivery of the anterior shoulder. *Erb palsy* results from injury to the spinal nerves $C_{5-6}$ and sometimes $C_7$. It consists of a paralysis of shoulder and arm muscles resulting in a hanging upper arm that may be extended at the elbow. Involvement of the lower spinal nerves ($C_7$–$T_1$) always includes injury of the upper nerves and results in a palsy including the hand, which can cause a clawhand deformity. Hardy (1981) studied the prognosis of 36 infants with brachial plexus injuries. Interestingly, shoulder dystocia had been reported in only 10 of these, and two had been delivered abdominally. Nearly 80 percent of these children had complete recovery by 13 months, and none with residual defects had severe sensory or motor deficits in the hand. Jennett and associates (1992) and Gherman and colleagues (1999) have presented evidence that brachial plexus injuries may precede the delivery itself and may occur even prior to labor.

***CLAVICULAR FRACTURE.*** Fractured clavicles are relatively common and have been diagnosed in 0.4 percent of infants delivered vaginally at Parkland Hospital (Roberts and co-workers, 1995). Such fractures, although at times associated with shoulder dystocia, often occur without any clinical events to suspect them. Investigators have concluded that isolated fractured clavicles are unavoidable, unpredictable, and are of no clinical consequence (Chez and co-authors, 1994; Roberts and co-workers, 1995).

**PREDICTION AND PREVENTION OF SHOULDER DYSTOCIA.** There has been considerable evolution in obstetrical thinking about the preventability of shoulder dystocia in the past two decades (Chap. 29, p. 758). During the 1970s, when the use of cesarean delivery was escalating rapidly, it was hoped that certain pregnancy risk factors could be used to identify women in whom cesarean delivery would avoid shoulder dystocia. During the 1980s it became apparent, however, that the rate of cesarean delivery was likely excessive. It also became obvious that predicting, and therefore preventing, shoulder dystocia was not simple. Although there are clearly several risk factors associated with shoulder dystocia, actual identification of individual instances before the fact has proven to be impossible.

***RISK FACTORS.*** A variety of maternal, intrapartum, and fetal characteristics have been implicated in the development of shoulder dystocia (Baskett and Allen, 1995; Nesbitt and associates, 1998; Nocon and co-authors, 1993). Several maternal risk factors, including obesity, multiparity, and diabetes, all exert their effect because of associated increased birthweight. For example, Keller and co-workers (1991) identified shoulder dystocia in 7 percent of pregnancies complicated by gestational diabetes. Similarly, the association of postterm pregnancy with shoulder dystocia is likely because many fetuses continue to grow after 42 weeks (Chap. 28, p. 738).

Intrapartum complications associated with shoulder dystocia include midforceps delivery and prolonged first- and second-stage labor (Baskett and Allen, 1995; Nocon and co-authors, 1993). McFarland and co-workers (1995), however, using matched controls, found that first- and second-stage labor abnormalities were not useful clinical predictors of shoulder dystocia.

The common thread running through all current reports on risk factors for shoulder dystocia is increased birthweight (Nesbitt and colleagues, 1998). Table 19–2 gives the incidence of shoulder dystocia related to birthweight groupings at Parkland Hospital during 1994. Clearly, shoulder dystocia increases with greater birthweight; however, almost half of the births with shoulder dystocia weighed less than 4000 g. Indeed, Nocon and co-workers (1993) described shoulder dystocia with birth of a 2260-g infant. Despite this, some authors (O'Leary, 1992) advocate identification of macrosomia with ultrasound and liberal use of cesarean delivery to shoulder dystocia. Others have disputed the concept that cesarean delivery is indicated for identified large fetuses, even those estimated to weigh in excess of 4500 g. Rouse and Owen (1999) concluded that a prophylactic cesarean policy for macrosomic infants would require more than 1000 cesarean deliveries and millions of dollars to avert a single permanent brachial plexus injury. The American College of Obstetricians and Gynecologists (2000) has concluded that performing cesarean deliveries for all women suspected of carrying a macrosomic fetus is not appropriate, except possibly for estimated fetal weights over 5000 g in nondiabetic women and over 4500 g in those with diabetes.

***PRIOR SHOULDER DYSTOCIA.*** Smith and colleagues (1994) identified recurrent shoulder dystocia in 5 of 42 (12 percent) women. Seven of these women had heavier infants in their subsequent pregnancy, but only two experienced recurrent shoulder dystocia. In contrast, Baskett and Allen (1995) found a much lower risk (1 to 2 percent) of recurrent shoulder dystocia.

**TABLE 19–2. Incidence of Shoulder Dystocia According to Birthweight Grouping in Singleton Infants Delivered Vaginally in 1994 at Parkland Hospital**

| Birthweight Group | Births | Shoulder Dystocia (Percent) |
|---|---|---|
| ≤ 3000 g | 2953 | 0 |
| 3001–3500 g | 4309 | 14 ( 0.3) |
| 3501–4000 g | 2839 | 28 ( 1.0) |
| 4001–4500 g | 704 | 38 ( 5.4) |
| > 4500 g | 91 | 17 (19.0) |
| All weights | 10,896 | 97 ( 0.9) |

***SUMMARY.*** The American College of Obstetricians and Gynecologists (1997, 2000) reviewed studies classified according to the evidence-based methods outlined by the United States Preventive Services Task Force. It concluded that the preponderance of current evidence is consistent with the view that:

1. Most cases of shoulder dystocia cannot be predicted or prevented because there are no accurate methods to identify which fetuses will develop this complication.
2. Ultrasonic measurements to estimate macrosomia have limited accuracy.
3. Planned cesarean delivery based on suspected macrosomia is not a reasonable strategy.
4. Planned cesarean delivery may be reasonable for the nondiabetic with an estimated fetal weight exceeding 5000 g or the diabetic whose fetus is estimated over 4500 g.

**MANAGEMENT.** Because shoulder dystocia cannot be predicted, the practitioner of obstetrics *must* be well versed in the management principles of this occasionally devastating complication. Reduction in the interval of time from delivery of the head to delivery of the body is of great importance to survival. An initial gentle attempt at traction, assisted by maternal expulsive efforts is recommended. Overly vigorous traction on the head or neck, or excessive rotation of the body, may cause serious damage to the infant.

Some have advocated performing a large episiotomy, and adequate analgesia is certainly ideal. The next step is to clear the infant's mouth and nose. Having completed these steps, a variety of techniques have been described to free the anterior shoulder from its impacted position beneath the maternal symphysis pubis:

1. Moderate **suprapubic pressure** is applied by an assistant while downward traction is applied to the fetal head.
2. The **McRoberts maneuver** was described by Gonik and associates (1983) and named for William A. McRoberts, Jr., who popularized its use at the University of Texas at Houston. The maneuver consists of removing the legs from the stirrups and sharply flexing them upon the abdomen (Fig. 19–10). Gherman and colleagues (2000) analyzed the McRoberts maneuver using x-ray pelvimetry. They found that the procedure caused straightening of the sacrum relative to the lumbar vertebrae, along with accompanying rotation of the symphysis pubis toward the maternal head and a decrease in the angle of pelvic inclination. While this does not increase pelvic dimensions, pelvic rotation cephalad tends to free the impacted anterior shoulder. Gonik and co-workers (1989) tested the McRoberts position objectively